IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **LARRY "CRAIG" TREYNOR**, an individual, | CIVIL ACTION |
| Plaintiff, | No.: |
| | Hon. |
| v. | |
| **KNOLL NORTH AMERICA, INC.**, a Delaware corporation, | |
| Defendant. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Larry "Craig" Treynor, by and through his attorneys, Kreis, Enderle, Hudgins & Borsos, P.C., hereby brings his Complaint against Defendant, Knoll North America, Inc., and alleges as follows:

## PARTIES

1. Plaintiff, Larry "Craig" Treynor, is an individual residing in Cedar Springs, Michigan.

2. Defendant, Knoll North America, Inc. ("Knoll") is a design firm that produces office systems, seating, files and storage, tables and desks, textiles, and accessories for the office, home, and higher education settings.

3. Knoll is incorporated under the laws of Delaware and conducts business nationwide, including at a facility located in Grand Rapids, Michigan.

4. Knoll maintains a registered office in Michigan and its registered agent can be served as follows: The Corporation Company, 30600 Telegraph Road, Bingham Farms, Michigan 48025.

1

## JURISDICTION AND VENUE

5. The controversy in this civil action falls within the jurisdiction of this Court pursuant to 28 U.S.C. §§ 1331 and 1367.

6. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

7. Plaintiff, Larry "Craig" Treynor ("Treynor"), who is sixty-four (64) years old, began his employment with Knoll on January 2, 2014 as a Maintenance and Facilities Supervisor.

8. In this role, Treynor's job duties included but were not limited to supervising the Union Maintenance department, managing outside contract services, supervising the maintenance of all manufacturing equipment, implementing a preventive maintenance program, and purchasing in support of Maintenance and Facilities.

9. Treynor's performance reviews show that he excelled in his position and his performance was routinely recognized by Knoll. In fact, Knoll rewarded Treynor with annual pay increases, usually amounting to a 2% raise.

10. In 2018, Treynor's job performance earned him a 4.7% raise.

11. During his employment with Knoll, Treynor was earning approximately $90,000 per year plus benefits.

12. Because Treynor was responsible for purchases in support of Maintenance and Facilities, he was also required to ensure that vendors were paid on time.

13. When Treynor first started at Knoll in 2014, the company gave him access to two company credit cards, one with a credit line of $20,000 and another with a credit line of $10,000. However, he typically did not use these credit cards for purchases because it was difficult for the company to track the expenses.

14. Knoll also gave Treynor access to the company's maintenance software system, which allowed the company to track the work and the related expenses that was being incurred. The software system had an invoice approval maximum set at $1,500.00. However, Knoll frequently incurred expenses well above that limit in connection with Maintenance and Facilities and there were problems getting vendors paid in a timely fashion.

15. As a result, Treynor was instructed by Knoll's management (specifically, by his then-supervisor, Dave Miller) to request that vendors split their invoices into lower amounts to come in below the $1,500.00 approval threshold. For example, if a vendor's total bill was for $2,400, Treynor was trained to write two purchase orders for $1,200 each and have the vendor send two matching invoices for $1,200 each so they could be processed through the software system in a timely manner.

16. Knoll – by and through Treynor's supervisors – was fully aware of this purchase order/invoicing practice for years and never raised any issues about it with Treynor or anyone else.

17. Unfortunately, Treynor was required to undergo two separate medical procedures in 2018 which forced him to take leave from work.

18. First, in March 2018, Treynor took 10 weeks of leave to undergo left knee-replacement surgery.

19. Knoll instructed Treynor to apply for short-term disability for this medical leave (which was approved by Unum) and never provided him with the required FMLA eligibility and rights & responsibilities notices.

20. After recovering from this first surgery, Treynor returned to Knoll in early June 2018 and resumed his job duties without any problems.

21. In early September 2018, Treynor alerted Knoll of his need to take a second medical leave starting October 3, 2018 in order to undergo right knee-replacement surgery.

22. Knoll again instructed Treynor to apply for short-term disability for this medical leave (which was also approved by Unum) and again failed to provide him with the required FMLA eligibility and rights & responsibilities notices.

23. On or about September 19, 2018, in the ordinary course of his job duties, Treynor requested that a Knoll vendor (*i.e.*, TMI Compressed Air Systems) split an invoice into six (6) smaller invoices so he could create six (6) matching purchase orders and process the payments through the software system (as he was trained to do by Knoll management from the start of his employment, and as he did for years without objection from Knoll).

24. On the same day, TMI created the six (6) invoices and submitted them to Knoll for payment.

25. On September 27, 2018, less than a week before Treynor was scheduled to take leave for his second knee surgery, Treynor's then-current supervisor, Tony Dykhouse, asked Treynor why TMI had split its invoices into multiple invoices for smaller dollar amounts.

26. Treynor explained to Dykhouse how Knoll trained him at the outset of his employment to handle larger invoices that could not be timely and efficiently processed through the software system.

27. Of course, Dykhouse was already two years into his employment with Knoll at that point and had full knowledge of this purchase order/invoicing practice. However, he never raised any issues about it with Treynor or anyone else until September 27, 2018.

28. Dykhouse seemed satisfied with Treynor's explanation and informed Treynor that, going forward, he wanted all vendors to submit one invoice per order/job because it was easier to track and monitor expenses.

29. Treynor agreed to comply with Dykhouse's instruction regarding the invoices.

4

30. Unfortunately, Treynor never got a chance to process another invoice for Knoll.

31. On October 3, 2018, Treynor underwent his second knee surgery and began his second short-term disability leave.

32. On November 20, 2018, Dykhouse called Treynor regarding a complaint Knoll had received from TMI that it was not paid on one of the six invoices. Treynor reminded Dykhouse about their prior discussion on September 27, 2018 regarding the purchase order/invoicing practice; however, Treynor was in pain and heavily medicated at the time and couldn't recall why TMI hadn't been paid in full. During the same call, Dykhouse requested copies the TMI purchase orders and invoices from Treynor, which he promptly provided to Dykhouse via email.

33. On November 29, 2018, while still out on leave, Unum notified Knoll in writing that Treynor's doctor had extended his medical leave until December 19, 2018, at which time he could return to work without restrictions.

34. On December 3, 2018, just four days after Unum notified Knoll of Treynor's extended return to work date, Treynor received a call from Dykhouse and Knoll's HR representative, Robert Carpenter, who informed Treynor that his employment was terminated effective immediately. Treynor requested the reason for his termination during the call, but Knoll refused to provide a reason.

35. A few weeks after his termination, Treynor received a termination letter (erroneously dated March 27, 2018 which, interestingly, aligns with the timeframe of his first medical leave),[1] confirming his termination was for allegedly "falsifying invoices."

---

[1] It is also interesting that Knoll subsequently produced Treynor's personnel file with a modified version of the termination letter, dated December 3, 2018. Treynor has both versions of the letter in his possession.

36. Treynor was stunned by Knoll's decision to terminate him, and its stated reason for doing so, especially because he was purportedly terminated for following the very purchase order/invoicing practice that Knoll trained him to perform and knew about for years.

37. Treynor did not falsify any invoices, as all invoices to Knoll came from vendors or other third parties.

38. At all relevant times, Knoll had possession of all invoices submitted by its vendors, which identified all expenses due and owing by Knoll.

39. At all relevant times, Knoll had copies of all purchase orders issued to vendors by Treynor and other employees.

40. At all relevant times, Knoll could easily track the work and expenses being incurred in Maintenance and Facilities with or without the purchase order/invoicing practice described herein.

41. Nevertheless, despite being fully aware of this practice for years, Knoll never raised any issues with Treynor prior to September 27, 2018 concerning the appropriateness of the purchase orders or invoices.

42. Knoll did not issue any verbal and/or written warnings to Treynor regarding the purchase order/invoicing practice prior to his termination.

43. Knoll replaced Treynor with an individual who is approximately 25 years younger.

44. Despite his reasonable efforts, Treynor has been unable to obtain comparable employment since Knoll wrongfully terminated his employment and, as a result, he continues to incur damages.

# COUNT I
# VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT ("ADEA")
# 29 U.S.C. § 621, *et seq*. – AGE DISCRIMINATION

45. Treynor hereby incorporates all of the preceding paragraphs.

46. As a sixty-year (64) year-old man, Treynor was a protected employee under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq*.

47. Knoll is an "employer" within the meaning of the ADEA, 29 U.S.C. § 630.

48. At all relevant times, Knoll had a duty under the ADEA not to discriminate or discharge with regard to a term or condition of Treynor's employment because of his age.

49. At all relevant times, Treynor was qualified for his position with Knoll.

50. Knoll violated Treynor's civil rights under the ADEA by:

   a. Treating Treynor differently than younger persons for engaging in the same or similar conduct.

   b. The supervisor responsible for Treynor's adverse treatment was predisposed to discriminate against Treynor and acted on that disposition.

   c. Discriminating against Treynor with respect to the terms, conditions, or privileges of employment.

   d. Terminating Treynor's employment because of his age and then replacing Treynor with a substantially younger employee.

   e. Other acts and/or omissions which shall become known during discovery.

51. Knoll's violation of the ADEA was willful and Treynor seeks damages for each violation.

52. As a direct and proximate result of Knoll's adverse actions, Treynor has suffered damages, including but not limited to, loss of past and future income and employee benefits, physical injuries, mental anxiety and emotional distress, loss of professional reputation, and loss

of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

## COUNT II
## VIOLATION OF ELLIOTT LARSEN CIVIL RIGHTS ACT, M.C.L. § 37.2201, *et seq*. — AGE DISCRIMINATION

53. Treynor hereby incorporates all of the preceding paragraphs.

54. At all relevant times, Knoll was an "employer" within the meaning of the Elliot-Larsen Civil Rights Act ("ELCRA"), M.C.L. § 37.2201, *et seq*.

55. At all relevant times, Knoll had a duty under the ELCRA not to discriminate or discharge with regard to a term or condition of Treynor's employment because of his age.

56. Knoll violated Treynor's civil rights under the ELCRA by:

   a. Treating Treynor differently than younger persons for engaging in the same or similar conduct.

   b. The supervisor responsible for Treynor's adverse treatment was predisposed to discriminate against Treynor and acted on that disposition.

   c. Discriminating against Treynor with respect to the terms, conditions, or privileges of employment.

   d. Terminating Treynor's employment because of his age and then replacing Treynor with a substantially younger employee.

   e. Other acts and/or omissions which shall become known during discovery.

57. Knoll knowingly and deliberately engaged in intentional acts of discrimination and violations of the ELCRA and further, acted with malice and/or with reckless indifference to Treynor's rights under the ELCRA.

58. As a direct and proximate result of Knoll's adverse actions, Treynor has suffered damages, including but not limited to, loss of past and future income and employee benefits, physical injuries, mental anxiety and emotional distress, loss of professional reputation, and loss

of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

## COUNT III
## VIOLATION OF MICHIGAN'S PERSONS WITH DISABILITIES CIVIL RIGHTS ACT ("PDCRA"), M.C.L. § 37.1101, *et seq.* – DISABILITY DISCRIMINATION

59. Treynor hereby incorporates all of the preceding paragraphs.

60. At all relevant times, Treynor was an "employee" and Knoll was an "employer" covered by and within the meaning of the Persons with Disabilities Civil Rights Act ("PDCRA"), M.C.L. § 37.1101, *et seq*.

61. While Treynor's medical condition did not adversely impact his ability to perform his job duties (as evidenced by his performance reviews), Knoll regarded Treynor as disabled, as that term is defined by and within the meaning of the PDCRA, M.C.L. § 37.1103(d).

62. Treynor's perceived disability was a determining factor in Knoll's decision to terminate Treynor and preclude him from returning to his former position as a Maintenance and Facilities Supervisor.

63. Knoll discriminated against Treynor, within the meaning of the PDCRA, by:

   a. Discriminating against Treynor on the basis of his perceived disability.

   b. Intentionally interfering with Treynor's ability to perform his job functions.

   c. Terminating Treynor's employment because of his perceived disability and then replacing Treynor with an employee who was perceived to not be disabled.

   d. Other acts and/or omissions which shall become known during discovery.

64. Knoll knowingly and deliberately engaged in intentional acts of discrimination and violations of the PDCRA and further, acted with malice and/or with reckless indifference to Treynor's rights under the PDCRA.

65. Knoll's stated justification for Treynor's termination is false and is a mere pretext designed to mask the unlawful discriminatory motivation behind its decision to terminate Treynor.

66. As a direct and proximate result of Knoll's adverse actions, Treynor has suffered damages, including but not limited to, loss of past and future income and employee benefits, physical injuries, mental anxiety and emotional distress, loss of professional reputation, and loss of the ordinary pleasures of everyday life, including the right to seek and pursue a gainful occupation of choice.

## COUNT IV
## VIOLATION OF FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2601 *et seq.* — INTERFERENCE

67. Treynor hereby incorporates all of the preceding paragraphs.

68. The FMLA makes it unlawful for any employer to interfere with, restrain, or deny the exercise of, or the attempt to exercise, any right provided under the FMLA. 29 U.S.C. § 2615.

69. Knoll engaged in a prohibited act under the FMLA by preventing Treynor from resuming his position as Maintenance and Facilities Supervisor. 29 U.S.C. § 2614.

70. Treynor gave Knoll adequate notice of his serious medical condition and resulting need for family medical leave, and Knoll interfered with, restrained, and/or denied the exercise of Treynor's attempt to exercise his protected right provided under the FMLA. *See Reeder v. Cty. of Wayne*, 694 Fed. Appx. 1001 (6th Cir. 2017) (holding that an employer's failure to provide the required notices interfered with the employee's right under FMLA to take protected leave).

71. Knoll knowingly and deliberately engaged in intentional violations of the FMLA and further, acted with malice and/or with reckless indifference to Treynor's rights under the FMLA.

72. As a direct and proximate result of Knoll's adverse actions, Treynor suffered damages, including but not limited to, loss of past and future income and loss of employee benefits.

**REQUEST FOR RELIEF**

WHEREFORE, Treynor requests relief and damages as follows:

a. A declaratory judgment that Knoll's actions alleged herein violate the Age Discrimination in Employment Act of 1967, 29 U.S.C. 521, *et seq.*, and attendant regulations;

b. A declaratory judgment that Knoll's actions alleged herein violate Michigan's Elliot-Larsen Civil Rights Act, M.C.L. § 37.2101, *et seq.*, and attendant regulations;

c. A declaratory judgment that Knoll's actions alleged herein violate Michigan's Persons with Disabilities Civil Rights Act, M.C.L. § 37.1201, *et seq.*, and attendant regulations;

d. A declaratory judgment that Knoll's actions alleged herein violate the Family Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, and attendant regulations;

e. Granting a monetary judgment in favor of Treynor and against Knoll and awarding Treynor all economic damages, liquidated damages, compensatory damages, and punitive damages available under the law;

f. Awarding reasonable attorneys' fees and costs incurred by Treynor in filing this action as provided by statute;

g. Awarding pre- and post-judgment interest to Treynor on these damages; and

h. Awarding such other and further legal or equitable relief as this Court deems appropriate.

## JURY TRIAL DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Treynor demands a trial by jury on all questions of fact raised by this Complaint.

Dated: September 13, 2019

Respectfully Submitted,

*/s/ Jesse L. Young*
Jesse L. Young (P72614)
Thomas J. Cedoz (P82094)
Kreis, Enderle, Hudgins & Borsos, P.C.
8225 Moorsbridge, PO Box 4010
Kalamazoo, Michigan 49003
(269) 324-3000
jyoung@kehb.com
tcedoz@kehb.com

*Attorneys for Plaintiff*