UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LARRY CRAIG TREYNOR,

    Plaintiff,

v.

KNOLL, INC., et al.,

    Defendants.

_____/

Case No. 1:19-cv-753

Hon. Hala Y. Jarbou

## **OPINION**

Defendant Knoll, Inc. terminated Plaintiff Larry "Craig" Treynor's employment in December 2018 and this lawsuit resulted. (Second Am. Compl., ECF No. 16, PageID.82.) Treynor alleges that he was fired because of his age, his perceived disability, and because he had to take medical leave for two knee surgeries. He asserts five causes of action. Count I claims a violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* Count II relies on Michigan's Persons with Disabilities Civil Rights Act (PWDCRA), Mich. Comp. Laws. § 37.1101, which parallels the ADA. Count III alleges a violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* Count IV rests on Michigan's parallel statute to the ADEA, the Elliot-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2201 *et seq.* And Count V claims a violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 *et seq.* Knoll has moved for summary judgment on Counts I-IV and for judgment on the pleadings/summary judgment on Count V. (ECF No. 34.) The motion will be denied with respect to Counts III-IV but granted with respect to Counts I, II, and V.

## I. Jurisdiction

The Court has jurisdiction over Treynor's federal law claims. 28 U.S.C. § 1331. Courts may exercise diversity jurisdiction over state law claims so long as no plaintiff is a citizen of the same state as any defendant and the amount in controversy exceeds $75,000. 28 U.S.C. § 1332. Treynor is a citizen of Michigan. (Second Am. Compl., PageID.78.) Knoll is incorporated in Delaware and has its principal place of business in Pennsylvania. (*Id.*) The amount in controversy is alleged to exceed $75,000. (*Id.*) Therefore, the Court has diversity jurisdiction over Treynor's state law claims.

## II. Background

This is a relatively fact-intensive case. All relevant events occurred in 2018. Though Treynor is fundamentally challenging his termination as unjustified, he asserts two broad bases, somewhat distinct, somewhat intersecting, for his claims. One saga relates to the practice of invoice-splitting at Knoll. The other thread relates to two knee surgeries and how Treynor was treated after those surgeries. Rather than give an entirely chronological account, background will be given on each issue separately, though some facts have overlapping relevance.

### A. Invoice-Splitting

Knoll manufactures office furniture. Treynor has an associate's degree in heavy equipment repair from Ferris State University. (Treynor Dep., ECF No. 40-3, PageID.695.) In January 2014, Knoll hired Treynor to be the Maintenance and Facilities Supervisor for its plant in Kentwood, Michigan. (*Id.*, PageID.676-677.) He held similar positions at various companies since 1998. (*Id.*, PageID.702.) He was 58 years old when he was hired. Knoll terminated Treynor in December 2018, when he was 63. (*Id.*, PageID.676-677.)

One function of his role as Maintenance and Facilities Supervisor was to order maintenance services from outside vendors to keep the Kentwood plant operating. (*Id.*, PageID.684.) However,

Treynor was only authorized to spend a certain amount of money. (*Id.*) Invoices that were less than the authorization limit could be approved by Treynor and submitted directly to Knoll's accounts payable department. (*Id.*, PageID.720-721; Dykhouse Dep., ECF No. 40-2, PageID.599.) Invoices exceeding Treynor's authorization had to be submitted to his manager for review and approval before being sent to accounts payable. (Dykhouse Dep., PageID.599.) The invoice approval process is central to this lawsuit.

Knoll frequently failed to pay vendors on time. (*Id.*, PageID.597; Lenar Dep., ECF No. 40-1, PageID.490-492.) Those vendors would refuse to provide additional parts or labor until outstanding invoices were paid, leading to risks that the Kentwood plant would have to temporarily cease operations. (Lenar Dep., PageID.490-492.) Many blamed the slow pace of approving charges that exceeded expense authorizations. (*Id.*) Those employees that had spending authorizations developed a work-around: they would split an invoice exceeding their authorization into multiple smaller invoices that fell within the authorization, and then submit those smaller invoices to accounts payable to ensure prompt payment. (*Id.*) For example, if an employee needed a $2,000 emergency repair but only enjoyed a $1,500 spending authorization, he or she would submit two $1,000 invoices and the vendor would be paid quickly. Treynor claims invoice-splitting was standard practice at the Kentwood plant. (Treynor Dep., PageID.687.) Dan Lenar, Treynor's direct supervisor from 2014-2016, approved of invoice-splitting. (Lenar Dep., PageID.493.)

Lenar took a new position in 2016, with Tony Dykhouse filling his old role. (*Id.*, PageID.517.) Treynor asserts that, like Lenar, his new manager was aware of invoice-splitting. (Treynor Dep., PageID.730.) He and Dykhouse directly discussed the practice at least once. In August 2018, Treynor contacted TMI Compressed Air (TMI) to conduct emergency repairs at the

3

Kentwood plant. (*Id.*, PageID.718.) As an emergency repair job, no purchase order was produced in advance and TMI did not provide a preliminary quote. (*Id.*, PageID.718-719.) TMI ultimately sent an invoice for $8,172.32. (TMI Invoice, ECF No. 39-7.) Treynor's spending authorization was only $1,500 at that time (Treynor Dep., PageID.684), so he split the payment across six invoices of $1,362.05 each. (Split TMI Invoices, ECF No. 39-9.) Treynor also had two company credit cards, one with a $10,000 spending limit and the other with a $20,000 spending limit. (Treynor Dep., PageID.715.)

According to Treynor, the TMI invoices came up during a weekly one-on-one meeting with Dykhouse on September 27, 2018. (*Id.*, PageID.715-716.) Dykhouse asked about the invoices, and Treynor said he had split them up. (*Id.*, PageID.716.) Dykhouse responded, "'[t]hat ain't the way we do things, and I don't want it done again.'" (*Id.*) Treynor agreed to stop splitting invoices. (*Id.*) The parties to this case agree that the TMI bill was the last time Treynor split invoices.

But the matter reared its head again around November 20, when TMI complained that it had only received partial payment for its August repair job. (*Id.*, PageID.721; Dykhouse Dep., PageID.627.) Dykhouse called Treynor to ask about the issue, who reminded him about the split invoices. (*Id.*) Dykhouse says he remembers discussing invoice-splitting in general back in September but believes that he first became aware of the split TMI invoices specifically during the November phone call with Treynor. (Dykhouse Dep., PageID.628.) He thought it was inappropriate to split the TMI invoices and alerted Robert Carpenter, a human resources official at Knoll, about the issue. (*Id.*, PageID.629.) Dykhouse told Carpenter that Treynor's circumvention of his spending authorization was an act of insubordination. (Carpenter Dep., ECF No. 39-11, PageID.420.) Though Knoll generally uses progressive discipline to handle employee misconduct, insubordination can warrant immediate termination. (Knoll Rules of Conduct, ECF

4

No. 39-16, PageID.451.) After a brief investigation, principally consisting of reviewing emails from Treynor orchestrating the invoice split, it was determined that Treynor would be fired. (Carpenter Dep., PageID.421.)

On December 3, 2018, Carpenter and Dykhouse called Treynor and told him that he was being immediately terminated. (*Id.*) Treynor claims that they refused to give a specific reason for his termination. (Treynor Dep., PageID.723.) Carpenter states that he told Treynor that the termination was for invoice-splitting, which he had been warned not to do, but declined to specify when Treynor was told not to split invoices. (Carpenter Dep., PageID.421.) Treynor says he did not receive a termination letter formally explaining the reasons he was fired until four weeks after the December 3 call. (Treynor Dep., PageID.724-725.) He was 63 years old at the time of termination. The man hired to replace Treynor is about 20 years younger. (Dykhouse Dep., PageID.586.)

### B. Treynor's Knee Surgeries

Treynor had both his knees replaced through two separate surgeries in 2018. (*Id.*, PageID.706.) He took time off work and went on short-term disability for each surgery.

In March 2018, Treynor took ten weeks off to have his left knee replaced. (*Id.*) He was instructed to apply for short-term disability, but Knoll never informed him of his FMLA eligibility or gave rights-and-responsibilities notices. (*Id.*, PageID.771-773.) Dykhouse largely filled in for Treynor while he was on medical leave. (Dykhouse Dep., PageID.639-640.) This created a couple extra hours of work for Dykhouse each day, though other employees helped keep the increased workload manageable. (*Id.*) During this time, Dykhouse would occasionally contact Treynor with work-related questions. (*Id.*, PageID.641.)

Treynor returned to his job in June 2018. (Treynor Dep., PageID.751.) He alleges that Dykhouse began to treat him differently. Dykhouse purportedly discounted Treynor's opinions

5

on "subjects that were Treynor's long-time job duties," preferring instead to seek the advice of Treynor's younger colleagues. (Pl.'s Opp'n Br., ECF No. 39, PageID.228 (citing Treynor Dep., PageID.749-750).) Treynor says that he was sidelined from projects he was working on prior to medical leave, and stopped being invited to meetings regarding those projects. (Treynor Dep., PageID.751-752.) When Treynor asked why his leading role on various projects was being curtailed, Dykhouse said it was because "'we don't do things the old school way.'" (*Id.*, PageID.754.)

In September, Treynor told Knoll that he needed his right knee replaced as well. (*Id.*, PageID.707.) He was again placed on short-term disability and began medical leave on October 3. (*Id.*) As with his previous surgery, Treynor says that no one notified him of his FMLA eligibility or rights and responsibilities. (*Id.*) Dykhouse again covered most of Treynor's job during his absence. (Dykhouse Dep., PageID.641.) On November 29, about a week after Dykhouse referred the TMI invoice splitting issue to Carpenter, Treynor's doctor told Knoll that his leave was extended to December 19, 2018, at which time he could return to work without any restrictions. (Insurance Letter, ECF No. 39-13, PageID.443.) As mentioned, Treynor was terminated on December 3, before he went back to work.

### III. Standards

#### A. Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Courts must examine the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," to determine whether there is a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P 56(c)) (internal quotations omitted). A fact is material if it "might affect the outcome of the

suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact is genuinely disputed when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249 (citing *First Nat'l Bank. of Ariz. v. City Serv. Co.*, 391 U.S. 253, 288-89 (1961)). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party [by a preponderance of the evidence], there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *City Serv.*, 391 U.S. at 289). In considering the facts, the Court must draw all inferences in the light most favorable to the nonmoving party. *Id.* However, "[t]he mere existence of a scintilla of evidence in support of [a party's] position will be insufficient; there must be evidence on which the jury could reasonably find for [that party]." *Anderson*, 477 U.S. at 252. Summary judgment is not an opportunity for the Court to resolve factual disputes. *Id.* at 249.

### B. Judgment on the Pleadings

"After the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). Courts apply the same standard of review when analyzing a motion for judgment on the pleadings as they do when deciding a motion to dismiss for failure to state a claim. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 295-96 (6th Cir. 2008). When deciding a Rule 12(c) motion brought by the defendant, a court must accept all the complaint's well-pleaded factual allegations as true, draw all reasonable inferences in favor of the plaintiff, and view the complaint in the light most favorable to the plaintiff. *JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). The motion may be granted only if the defendant is nevertheless entitled to judgment. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010). A Rule 12(c) motion may be brought to challenge the legal sufficiency of the complaint, as well as to raise an affirmative defense. *Hindel v. Husted*, 875 F.3d 344, 346-47 (6th Cir. 2017).

## IV. Analysis

### A. Disability Discrimination Claims

Both the ADA and PWDCRA prohibit firing an employee because of an actual or perceived disability. *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521-22 (1999) (ADA covers employees regarded as disabled by employers); *Chiles v. Mach. Shop, Inc.*, 606 N.W.2d 398, 406-07 (Mich. Ct. App. 1999) (same for PWDCRA) (citing Mich. Comp. Laws § 37.1103(d)(iii)). "The PWDCRA substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.*, 667 F.3d 757, 764 (6th Cir. 2012) (internal quotations omitted). The Court discerns no substantive differences for the purposes of this case.

Treynor asserts that he was regarded as disabled. (Second Am. Compl., PageID.84-86.) "[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that their employer believed they had a 'physical or mental impairment,' as the term is defined in federal regulations." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 319 (6th Cir. 2019). "The employer may then rebut this showing by pointing to objective evidence 'that the impairment is . . . both transitory and minor.'" *Id.* (quoting 42 U.S.C. § 12102(3)(B)). Even assuming Treynor has made a valid showing of perceived disability, Knoll has met its burden in rebuttal.

The record shows that, when not on medical leave, Treynor ably performed his job when he returned to work. The sole evidence speaking to Treynor's condition when he returned to work comes from Dykhouse's deposition, where he said the only impact he could see was that Treynor had reduced mobility and "ha[d] to use a cart to get around the shop." (Dykhouse Dep., PageID.653.) He added, "then again, other people used the cart as well, but he seemed to rely on a cart more frequently than others, which was what I considered understandable based on the fact that his knees were sore." (*Id.*) At worst, Treynor experienced a minor impairment at work from

8

his surgeries; none of his major life activities were substantially limited by the knee surgery. *See* 42 U.S.C. § 12102(4); *Neely v. Benchmark Fam. Servs.*, 640 F. App'x 429 (6th Cir. 2016) (asserted impairment is minor when it does not affect ability to work).

This impairment was also transitory in nature. The ADA defines "transitory" as something with "an actual or expected duration of 6 months or less." 42 U.S.C. § 12102(3)(B). The need for knee surgeries did prevent Treynor from working, but only for periods of about ten weeks. For each surgery, he went on medical leave for approximately ten weeks and then was cleared to return to work without restrictions. (*See* Treynor Dep., PageID.751.) To the extent that Treynor's knee problems prevented him from working, such substantial impairment lasted less than six months.

Knoll has met its burden; a reasonable jury could not conclude Treynor's impairments were anything other than transitory and minor. Treynor argues that Knoll raises this issue too late in the game. (Pl.'s Opp'n Br., PageID.247 ("Knoll failed to plead the "transitory and minor" limitation as an affirmative defense.").) The Sixth Circuit has recognized the "transitory and minor" limitation as an affirmative defense. *Babb*, 942 F.3d at 319; *Harrison v. Soave Enters. L.L.C.*, 826 F. App'x 517, 526 (6th Cir. 2020). But there is no indication that it must be expressly asserted as a defense at the pleadings stage; the Court could not find a case denying the "transitory and minor" defense on grounds of waiver and at least one Circuit Court has stated that defendants need not raise "transitory and minor" as an affirmative defense in their pleadings. *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 246 n.25 (3d Cir. 2020) (calling the affirmative defense designation "imperfect shorthand"). In its answer, Knoll denied that it regarded Treynor as disabled and that is sufficient. Knoll is entitled to summary judgment on the ADA and PWDCRA claims.

### B. Age Discrimination Claims

Treynor fares better with respect to his age discrimination claims.

9

Both the ADEA and the ELCRA prohibit firing employees because of their age.  29 U.S.C. § 623(a)(1); Mich. Comp. Laws § 37.2202(1)(a).  Claims brought under both statutes are "analyzed . . . under the same standards." *Geiger v. Tower Auto.*, 579 F.3d 614, 626 (6th Cir. 2009); *see also Town v. Mich. Bell Tel. Co.*, 568 N.W.2d 64, 67-68 (Mich. 1997).  As with disability discrimination, age discrimination claims may be proved either through direct or circumstantial evidence.  *Id.* at 620.  Where the plaintiff relies on circumstantial evidence, courts must apply the burden-shifting standard set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973).  *Geiger*, 579 F.3d at 620.

The *McDonnell Douglas* standard has three steps. First, the plaintiff must establish a *prima facie* case of discrimination. If the plaintiff does so, the defendant-employer must "articulate some legitimate, nondiscriminatory reason" for its action. If the employer-defendant can do so, the burden shifts back to the plaintiff, who must produce evidence showing that the reason given by the defendant-employer was merely pretextual.  *McDonnell Douglas*, 411 U.S. at 803-05.

### 1. Treynor establishes *prima facie* case of age discrimination

"To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must show that (1) he was at least 40 years old at the time of the alleged discrimination; (2) he was subjected to an adverse employment action; (3) he was otherwise qualified for the position; and (4) he was replaced by a younger worker." *George v. Youngstown State Univ.*, 966 F.3d 446, 464 (6th Cir. 2020) (internal quotations omitted).

Knoll misstates the third element of the *prima facie* test and then argues that Treynor fails to meet that element.  Knoll claims that Treynor must show "that he was performing his job at a level that met Knoll's legitimate expectations."  (Def.'s Br., ECF No. 34, PageID.157.)  Since he split the TMI invoices to exceed his spending authorization, Knoll says that Treynor did not meet its legitimate expectations and thus fails to satisfy this prong.  (*Id.*, PageID.158.)  This argument

10

is meritless. The third element of the test simply asks whether the employee was otherwise *qualified*. Case law is clear that this inquiry "should focus on criteria such as the plaintiff's education, experience in the relevant industry, and demonstrated possession of the required general skills." *George*, 966 F.3d at 464-65. Whether Treynor was doing a satisfactory job in Knoll's eyes is besides the point and properly addressed under the "legitimate purpose" prong of the *McDonnell Douglas* standard.

Treynor is qualified: he holds a relevant college degree and has many years of experience in roles similar to the one he performed at Knoll. (Treynor Dep., PageID.695, 702.) He satisfies the other elements, too. He was over 40 when he was fired (an adverse employment action) and replaced with someone younger. (Dykhouse Dep., PageID.586.) Treynor has established a *prima facie* case of age discrimination.

### 2. Knoll articulates a legitimate, nondiscriminatory reason for termination

Having a established a *prima facie* case, the burden now shifts to Knoll. It must articulate a legitimate, nondiscriminatory reason for firing Treynor. Knoll says it terminated Treynor for the "irregularities with the TMI invoice." (Def.'s Br., PageID.158.) In its eyes, Dykhouse at some point told Treynor not to split invoices to circumvent his spending limit; he did so anyway, which constituted an act of insubordination and immediate termination was justified. Insubordination is a legitimate, nondiscriminatory reason for terminating an employee.

Treynor argues against this conclusion. At heart, he claims that Knoll has not provided a legitimate reason because the reason given – insubordination for splitting the TMI invoice – is fabricated. (Pl.'s Opp'n Br., PageID.239-240.) By Treynor's account, which is not seriously disputed by Knoll, he was not insubordinate because he stopped splitting invoices the moment Dykhouse told him to. (*Id.*, PageID.240.) He says that insubordination over invoice-splitting is not legitimate because Dykhouse knew about the TMI invoice in September 2018 and only decided

11

to present the issue to human resources in November, feigning ignorance of their previous conversation about the invoice. But firing someone for breaking the rules is not illegitimate. It may be actionable where the legitimate reason was merely a *pretext* for discriminatory conduct. Treynor's arguments on this point fail because they speak to pretext, not to the legitimacy of firing someone for insubordination in the abstract. Knoll has articulated a legitimate, nondiscriminatory reason for terminating Treynor.

### 3. Treynor can demonstrate pretext

Where the defendant has articulated a legitimate, nondiscriminatory reason for termination, the plaintiff can save his claim by presenting evidence that the proffered reason is merely a pretext for discriminatory conduct. *Geiger*, 579 F.3d at 626. A plaintiff "can demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 597 (6th Cir. 2007) (internal quotations omitted). "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000). "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation." *Id.* (emphasis deleted). Treynor can demonstrate pretext based on evidence of ulterior motives and insufficient justification.

Taking Treynor's assertions as true, Knoll gives an implausible story of his termination, which a reasonable jury could therefore view as pretextual. Treynor claims that splitting invoices to circumvent spending limits was standard practice, even encouraged, at the Kentwood plant. He states that he and Dykhouse witnessed a conversation in which other managers discussed invoice-splitting. (Treynor Dep., PageID.730.) Thus, it should have come as no surprise to Dykhouse to

12

learn that Treynor split the TMI invoice. Dykhouse told Treynor to stop splitting invoices and he did. By Treynor's account, Dykhouse knew about the TMI invoice, told Treynor to stop splitting invoices, and then inexplicably tried to have Treynor fired for insubordination over the same invoice two months later. Taking the foregoing as true and viewing everything in the light most favorable to Treynor, the circumstances behind his termination seem suspicious. Contrary to Knoll's contentions, Treynor does not have to show "real evidence of an ulterior motive." (Def.'s Reply Br., ECF No. 40, PageID.467.) A jury could reasonably *infer* an ulterior, discriminatory motive based on the circumstantial evidence that Knoll's explanation is implausible.

A jury could also find pretext by concluding that Knoll's explanation is insufficient to warrant termination. Showing insufficient justification "ordinarily consists of evidence that other employees, particularly employees not in the protected class, were not fired even though they engaged in substantially identical conduct to that which the employer contends motivated its discharge of the plaintiff." *Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 471-72 (6th Cir. 2002) (internal quotations omitted). Treynor states that Dykhouse knew other employees were splitting invoices in the same manner as he was. (Treynor Dep., PageID.730.) He also identified invoices submitted between June and August 2018 that demonstrate others were invoice-splitting. (*Id.*, PageID.741-743.) Those invoices featured identical dollar amounts attributable to the same vendor, such as two invoices for $1,295.00 each or another two for $1,470.43. (*Id.*) This is evidence that other employees were splitting invoices straight down the middle – just like Treynor – mere months before he was told to stop invoice-splitting. Only Treynor was terminated.

### 4. Treynor's age discrimination claims survive

The *McDonnell Douglas* formula has been applied and satisfied: (1) Treynor has made a *prima facie* showing of age discrimination; (2) Knoll articulated a legitimate, nondiscriminatory

13

purpose in terminating Treynor; and (3) evidence suggests that the reason articulated was merely pretextual because Knoll's story does not hold up.

Knoll argues that demonstrating pretext does not relieve Treynor of the burden of showing that his age was a but-for cause of termination, which is true. (Def.'s Reply Br., PageID.468 (citing *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993)).) However, Knoll's contention that Treynor has failed to meet that burden is incorrect. In *Phelps*, the Sixth Circuit upheld dismissal of the plaintiff's ADEA claim, finding that "all of the evidence . . . produced in support of [the plaintiff's] claim that [the defendant's] reason for the discharge was pretextual fail[ed] to establish that age was a determining factor as required by law." *Phelps*, 986 F.2d at 1023. But claims of discrimination are context-specific. *See id. Phelps* dealt with a very different situation – there, the plaintiff alleged discrimination after many employees were fired as part of downsizing and only the youngest of those employees were later rehired. *Id.* at 1025.

Here, only Treynor was fired, apparently the sole employee punished for a widespread practice. He was then replaced with a younger worker. These are very different facts. And, as mentioned, a jury can infer but-for causation based solely on its disbelief of an employer's proffered explanation for a *prima facie* case of discrimination. *Reeves*, 530 U.S. at 147 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993)). In this particular case, assuming that the jury believes Treynor and not Knoll, the jury could properly infer that Knoll fired Treynor because of his age. The Court will not grant summary judgment on the ADEA and ELCRA claims.

**C. FMLA Claim**

In Count V, Treynor makes an FMLA interference claim. The FMLA states that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period" for, among other things, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). It is "unlawful for

14

any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the FMLA. 29 U.S.C. § 2615(a)(1). Employers are required to give written notice that requested time off will be counted as FMLA leave and must provide "detailed information concerning the employee's rights and responsibilities under the [FMLA]." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 87 (2002) (citing 29 C.F.R. § 825.301(c)). A plaintiff alleging interference based on the employer's failure to provide notice must also show that he or she was prejudiced by that lack of notice. *Coker v. McFaul*, 247 F. App'x 609, 619 (6th Cir. 2007) (citing *Edgar v. JAC Prods., Inc.*, 443 F. 3d 501, 508 (6th Cir. 2006) (citing *Ragsdale*, 535 U.S. at 89)).

Here, Treynor alleges that Knoll failed to provide FMLA notices each time he had knee surgery. (*See* Second Am. Compl., PageID.88.) Knoll argues, and the Court agrees, that Treynor has failed to allege prejudice. Treynor alleges that "Knoll engaged in a prohibited act under the FMLA by preventing Treynor from resuming his position as Maintenance and Facilities Supervisor." (*Id.*) But on the face of the complaint, Treynor took more than 12 weeks off work during 2018 for his surgeries, meaning that the FMLA's protections would not apply. *Ragsdale*, 535 U.S. at 88-89. Hence, the only way Treynor could show prejudice is to demonstrate that, had he been informed of his FMLA rights, he would have delayed his second surgery so that he could continue to enjoy the FMLA's protections. *See Donahoo v. Master Data Ctr.*, 282 F. Supp. 2d 540, 555-56 (E.D. Mich. 2003) (no prejudice for lack of notice because plaintiff had to miss more than 12 weeks of work for treatment). Treynor provides no allegations speaking to the urgency (or lack thereof) behind the second surgery, nor does he allege that he would have delayed his second surgery (assuming it was medically possible) had he known about the FMLA's 12-week limit. The complaint is deficient and Knoll is entitled to judgment on the pleadings.

In opposing the motion, Treynor offers a different basis for an interference claim: Dykhouse contacted him regarding work-related matters while he was on medical leave. (Pl.'s Opp'n Br., PageID.249-250.) In certain circumstances, courts have held that an employer's request that an employee perform work during medical leave can constitute interference under the FMLA. *See Arban v. West Publ'g Corp.*, 345 F.3d 390, 402-06 (6th Cir. 2006). This type of interference was never alleged in Treynor's complaint. His claim was based solely on Knoll's refusal to hold his job while he was on medical leave; he does not mention being required to perform work. (*See* Second Am. Compl., PageID.88.) "A non-moving party plaintiff may not raise a new legal claim for the first time in response to the opposing party's summary judgment motion." *Tucker v. Union of Needletrades, Indus. & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005) (internal quotations omitted). The Court will not address the question of whether Dykhouse's conduct could constitute interference because there are no relevant allegations in the complaint.

## V. Conclusion

For the foregoing reasons, Knoll's motion will be denied with respect to Counts III-IV but granted with respect to Counts I, II, and V. Counts I, II, and V will be dismissed. An order will enter consistent with this Opinion.

Dated: February 16, 2021                    /s/ Hala Y. Jarbou
                                                                    HALA Y. JARBOU
                                                                    UNITED STATES DISTRICT JUDGE